And the court will proceed to the third case, Bielfeldt v. Graves. Mr. George. Good morning, Your Honor. May it please the court, my name is John George, and I'm here on behalf of the plaintiffs, appellants, David Bielfeldt and Karen Wales. We are seeking reversal of the summary judgment order that was entered by the Central District of Illinois District Court magistrate judge sitting on the consent of the parties. There were two orders entered. One was the summary judgment order, and then secondly, there was an order for costs. We're seeking reversal of both of those. The summary judgment was entered against plaintiffs on two federal claims. One brought under the Federal Securities Laws, Securities Exchange Act 1934, Mipple 10b-5. The second was under RICO. These claims arose out of a business in which Mr. Bielfeldt and the defendant, Mr. Graves, were equal partners. 50-50 owners of the 15 shares each of the outstanding 30 shares of the Class A voting stock of the company. Ms. Wales had, I believe, two shares of Class B non-voting stock. Mr. Bielfeldt and Graves were the only directors and the only two Class A shareholders. The home was governed by bylaws that gave the two directors power to issue stock and make all the usual director decisions, and also a stock restriction agreement, which was referred to as the SRA, Class A stock restriction agreement, that gave Mr. Bielfeldt and Mr. Graves power to agree or disagree on what were called major events. There were 14 enumerated major events, ranging from selling large assets, firing and hiring important people, including, and particularly for this litigation and this appeal, issuing debt or equity. Let's, if we may, turn for a moment to the 10b-5 claim. Sure. You can certainly have a 10b-5 claim when you, when there's an issuance of stock, but our plaintiffs here are not in the usual situation. The plaintiffs here are really not purchasers of the stock. How, why is this a 10b-5 case? How do you make out a 10b-5 case here? The briefs don't speak directly to that on either side, and it is a question that really needs to be explored somewhat. Thank you, Ron. They are standing here under 10b-5, which, as we know, applies to the purchase or sale of securities. The issuance to Graves was an issuance of securities. That was a sale. Because of the volume, the fact that it was 99 percent of all the outstanding stock, it was also a de facto diminution or sale of Buettel and Wales' interest in the company. But the point is there was an issuance of stock, and it caused damage to the plaintiffs. But not as purchasers. Not as purchasers, no. There was an attempted purchase of their remaining shares, but that was never consummated, and we're not relying on that attempt. We do have cases that kind of restrict 10b-5 to purchases. Well, Your Honor, that's true. Most often that's the case where it is. But here, because of the unusual nature and the fact that the plaintiffs were harmed in their own ownership, Well, that gives you a preemptive right state cause of action. I understand that, but I don't see how it gives you a 10b-5 case in light of the Supreme Court precedent that limits 10b-5 to purchases. Well, Your Honor, this is, again, a forced sale of their interest by the fact that the issuance to Mr. Graves took the value of their holdings in the company from, as was the case of Mr. Bielfeld, 50-50, to less than 1%, so 99% of the shares. Well, how about this? You do also plead that they were bringing shareholders derivative actions. Yes, and I was going to come to that next. Suppose you do. Are you in any better shape in pleading a shareholder? You know, I don't see how you get around blue chip. That's my big problem. Do you get around blue chip any better if you bring it as a shareholder's derivative action? Yes, Your Honor, because Would you explain that to us, please? Sure. In this case, the company, Elm Corporation, was a seller. And our theory was that the sale, Mr. Graves, was for inadequate consideration and, therefore, harmed the corporation. We cite the First Circuit case from Solar showing where a company can bring a cause of action under the securities laws for sale of its own securities. Here we say the consideration was inadequate for several reasons, one of which was that the stock restriction agreement on its face says that issuance of new securities has to be for cash. And this was not a sale for cash. It was a sale in exchange for debt. And that caused harm to the company because they didn't get what the company was entitled to under the stock restriction agreement. And stock was issued contrary to not only the stock restriction agreement, which has the prerogative rights provision that Judge Ripple mentioned, but also has the bylaws that have requirements that the directors have to issue shares by unanimous consent. And Mr. Buehlfeld never agreed to issue these particular shares. Your 10B-5 is based on the May 12, 2014 letter, isn't it? Yes, we say that was. And you're saying that that omitted a material fact of the amount of the issuance of securities, correct? Right, right. Do you agree that by not responding in writing to that letter, your client consented to the letter, to the issuance, to the major event that's detailed in that letter? No, not to the issuance that happened. It says right here that specifically Article 8, et cetera, major events, the issuance of debt or equity interest in the company. And your client never responded to that letter at all? Well, he never responded in writing. Well, but doesn't the SRA require him to? It definitely requires it in writing. You're trying to hold the defendants to the letter of these agreements, and your client didn't observe those very agreements, right? Well, not quite, not quite. You say he orally objected, but that's not what it requires. No, and we're not relying on that oral objection. Okay, so let me ask you another follow-up question, and then I'll be quiet for a minute. Assuming that he consented to the issuance of any securities, you're saying they should have told us it's 99 percent, and they didn't, and they omitted that. But even if they gave Mr. Graves one share of stock, he would then become the majority shareholder, would he not, because they were 50-50? That's correct. Okay, and therefore, your claim would really be a breach of the agreements to hold a director's meeting to actually issue the stock, correct? Well, that's part of the claim, but I want to go back to the Article 7. Well, but no, just answer my question, and you can go back to whatever you want to. Okay. Right? That would be your claim, that they should have then taken the second step that the agreements required. Right. Right? That's not a 10B-5 claim, is it? That's a breach of contract claim, is it not? Well, it's a breach of contract claim and breach of the agreements. And that's basically what the judge said. I don't see a federal claim here. I see a breach of contract claim that I'm going to decline to exercise jurisdiction over. Isn't that where you're at in this case? Well, that's certainly what the magistrate judge found, and we disagree with that because he said that there was no omission or misstatement. It was connected to the issuance of the stock. And, in fact, because Article 7 requires at some point that Mr. Graves give Mr. Bielfeld information regarding what the issuance was going to be and give him notice of the terms, opportunity to participate in terms of the implied number of shares. That share then would have been issued under Article 7, and he would have had a chance to buy one more additional share in order to preserve the 50-50 position that was inherent in the stock restriction agreement. But he would be a minority shareholder at that point. Well, not until the shares are actually issued. He's agreed to an issuance that would make him a minority shareholder if he didn't exercise his preemptive rights under Article 7. But Article 7 would require that the preemptive rights provision, Article 7, require that he be offered that chance to purchase. And the fact that he wasn't, in fact, that 100% of the share virtually of the company were given to somebody else was not what he consented to impliedly when he failed to respond in writing to Mr. Graves' letter. But in their earlier communications, Graves wanted him to contribute more money, and he declined. So Graves puts up this $185,000 note and basically saves the company, correct? Because it was going under at the time. Well, that's in dispute. They say in their brief they saved the company. There was testimony below from Mr. Bielfeld that he didn't necessarily believe that. That's a disputed fact that was not considered below. But if it were to go back, certainly there would be a dispute as to whether this was – I'm just having trouble with the notion of a material omission when there was consent to the issuance of stock by virtue of his not having responded to this letter. Well, again, all I can say – I see your point. I definitely see your point. And the response is he agreed to some issuance of debt or equity. We know. We have to accept that. That's by not responding. But it didn't necessarily mean that he would therefore consent that Mr. Graves should be entitled to take stock. So your point is he didn't know how – from the letter, he didn't know how much stock. Right. And at some point, that notice had to be given. When we say if there was only one communication, it should have been in the one communication that happened, which was the May 12, 2014 letter. But take Judge Yellen's point. You could very well have said, okay, you consented to it. Now, here's what's going to happen. Here's our second notice. And so you really know the terms. And at that point, Mr. Bielefeldt would have gone, yikes, that's not what I agreed to. I want to participate. And now I'll put the money in to try to rectify things. All he had to do was write a letter and saying, I disagree. And if he had, we wouldn't be here. But he didn't. And that doesn't mean that he necessarily consented to essentially losing his entire interest in the company. I see I'm at my – Do you want to reserve some time, Mr. George? I will. Thank you. All right. Thank you, Mr. George. Mr. Doyle. Thank you, Your Honor. Good morning. It wasn't $185,000. It was $1.8 million. I'm sorry. You're right. But who's counting, right? It was a lot of money at a time where the company, I think the record's undisputed, really needed some money. I'd like to put some procedural context for purposes of what's before this court. When the parties cross-moved for summary judgment, the issue of whether there was a material misrepresentation or omission was the heading in Mr. Biefeldt's paperwork, but he never argued an omission. He argued that the omission came up after, after they lost, and then they said, well, wait a minute. We're going to put in artificially all these added requirements as to what was required in that May 12th letter. There is no basis in the record in Article 8 or in the SRA that that additional information that you now own 51 percent of the company, that 3,900 shares are going to be issued, there is no provision that says that. The article says a major event qualifies as an issuance of equity, an equity interest, which is what happened. Subsequently, that was valuated and shares were issued. That's not an Article 7 issue. Nowhere in the record did they show how once you've complied with a major event in Article 8 that Article 7 is somehow triggered. There is no tie between those two. And the reality is the representation was also that there was a forced sale of his interest. Mr. Biefeldt still owns his shares. The subsequent two letters that have been discussed went to Graves attempting to purchase those shares. The valuation in those letters, at which there's a dispute, go to the valuation. They don't go to the prior issuance of the equity. If there was an issuance to those, it would be contractual, and as Judge Hawley found, it would be a state court issue. Can I ask you a more fundamental question? Sure. The two federal counts here, count 1 and count 9, were against the individuals, correct? The answer is correct because I'm looking at it. Yes, but the following sentence says it's also done derivatively on behalf of the club. Right, but it's against the individuals as a derivative count for the benefit of the corporation. The corporation was the move-in, correct? Yes. The individuals were not the move-ins. That's correct. And the judge entered a summary judgment for the corporation. Yes. Even though the corporation wasn't the defendant. So I'm confused about who's before this court as a party as a result of that. We have the case citation in the latter part of our brief that talks about when you have serious allegations, you can treat individuals or executives and the company more or less collectively. This has been a hotly contested case. We have been for years in front of Judge Hawley. And in order to streamline the economics and the issues, we have not redone or redundantly done paperwork. But they could have filed me two motions or me two statements adopting the corporation's motions for summary judgment on the federal counts. Could they not have? But on the first round of summary judgment that led into all of this, they did. Yes, but on the ones being appealed, they did not. I will let Mr. Zabeck address that if that's all right. But it was our understanding, and I was at the hearing with Judge Hawley, that he treated all of this collectively and was rolling over those underlying motions into this motion. And he addressed those in, I believe, the introduction to his order and in ultimately concluding that those would not be addressed. So it was always the court's intent, through a whole variety of motions through the history of the case, to collectively treat the defendants together when it was more efficient. And was that articulated in the proceedings in the district court? I believe it was in the order from Judge Hawley, where he had the parties get on the phone with him and go over the effect of having cross motions for summary judgment and how that might lead to entertaining the subsequent motion for summary judgment, which he granted. And also, I note that the corporate standing to raise this issue was never raised down below by Mr. Biefeld. So I don't believe it's an argument before the court. OK, thank you. Biefeld, before this court, argues the issuance of equity constituted a material misstatement or omission. We believe that he is incorrect on both in light of the fact that there was consent. The element which he pled necessary to give him federal jurisdiction. After all, this case started in state court. Instead of filing an answer, they filed in federal court and had to go to the issuance of the equity interest. Once it was determined that the equity interest was consented to by not responding in writing to the letter, the court held that a necessary element to the federal counts that provided for federal jurisdiction were no longer present. With that, I'm going to pass it to Mr. Zaback. Thank you for your time. Mr. Zaback? Good morning, Your Honors. May it please the court. I'm up here for, I represent Lee Grace and Jim Borzak individually. I'm up here for a very limited purpose, and I believe Judge Edelman was speaking about it, really to talk about this issue of standing. Again, I believe Mr. Doyle touched on it briefly. The issue really wasn't raised at the trial level, so I believe the issue is actually waived for purposes of this court, but I did want to talk about it. First and foremost, as was indicated, ELM, through Mr. Doyle, filed a motion for summary judgment with regard to its counterclaim, the declaratory action. The court then, after reviewing the cross motions, because Biefeld and Ms. Wales filed a cross motion, said, I want to have a phone conference with everyone. And that was September 27th. Those transcripts are in here, and I believe this gets close to what you were discussing earlier. Said, if I find there's consent, and I'm not saying I will or won't, but if I do, I'd like to know how that affects these federal claims. And he invited the movement, at that time, Mr. Doyle, because it was his motion, to brief those specific issues. Now, we did file a joinder into the original motion for summary judgment on the DEC action. The court viewed the defendants collectively as a whole, and it referred to the defendants filing a motion. And the court also made this, I guess, motion on counts one and nine, seem like a supplemental motion. In fact, it said, I don't need all the facts rebriefed. I don't need introductions. All I really want to know is, if I find there is consent, how does that affect these counts? So, to answer Your Honor's question earlier, by joining in the original motion, it was our perception that we actually joined in the supplemental motion, is what I'll call it. So I think Lee Graves and Jim Borzak individually did join this motion through the joinder of the first motion. And that's certainly our position. Regardless of that, though, I think the court certainly has the authority to enter an order for summary judgment at any point in time. And interestingly, this point is not even refuted in the reply brief from the plaintiffs. That's because I don't think there is any argument. As long as there's adequate notice, and clearly Judge Holly gave adequate notice of his intent. And they had an opportunity to respond. Clearly they had an opportunity to respond. So whether or not we joined in this motion, certainly the district court had the authority to enter the order. So I think, based upon those two reasons, and also the interest of judicial economy, I think, coupled with Mr. Doyle's arguments, what I've said up here, that the district court decision should be affirmed. Thank you, Mr. Zabek. Mr. George. Thank you, Your Honor. I will be brief. I want to respond to a couple of points that were made. One was the argument that there is no tie in the stock restriction agreement between Articles 7 and Article 8. I just simply invite the court to review those. I don't think reasonable reading of Article 8, which deals with the major events provision, can somehow be read to trump Article 7's preemptive rights provision that gave Mr. Bielfeld the right to participate in this particular issuance. Also, I heard them say that Mr. Bielfeld and the Whales still own their shares. Well, yeah, they still own their shares. Those shares were not sold. The forced sale that I was alluding to is the fact that Mr. Bielfeld went from a 50-50 partner in a company that at one point was worth over $9 million to having a share interest that was valued at $50,000 a year later. So definitely his interest was taken from him. As to who's before this court, we raise that point because it is anomalous to have the derivative plaintiff represented by separate counsel, which normally happens because the derivative plaintiff stays neutral. We refer to the corporate neutrality doctrine, which this court, this last year, in the Lord Bissell case, said it's a matter of Illinois corporate law. I can't find any Illinois corporate law that says they adopt the corporate neutrality. Did you raise that with the judge in the district court? That was raised not in the summary judgment proceedings, but it was raised in an earlier motion when, in response to the Third Amendment complaint, Elm asserted the counterclaim, which began this whole briefing thing, and plaintiffs moved to strike that, citing the corporate neutrality doctrine. At that point, I think the only case in Illinois that seemed relevant at one point was Judge Shaw's decision in the Loewen case, I believe it is. And as well, there is a case we cite from Arkansas that talks about this at great length. But I'm finished, so I'd just like the court to reverse and remand this. Thank you very much. Thank you, Mr. George. Thank you, Mr. Doyle. And thanks, Mr. Saber. Thank you, Mr. Saber. Thank you, Mr. Saber. There was reference here, and there's reference in— Oh, I apologize. Case is taken under advisement.